UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN BAZIKIAN,

                Plaintiff,

        -against-                                          1:12-CV-0664 (LEK)

CAROLYN W. COLVIN, Commissioner
of the Social Security Administration,[1]

                Defendant.

_____

**MEMORANDUM-DECISION and ORDER**

**I.    INTRODUCTION**

Before the Court is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff John Bazikian ("Plaintiff") benefits. Both parties have filed briefs. Dkt. Nos. 11 ("Plaintiff's Brief"); 14 ("Defendant's Brief"). For the reasons discussed below, the case is remanded to the SSA to: (1) further develop the administrative record; and (2) re-assess Plaintiff's Residual Functional Capacity ("RFC") using a function-by-function analysis of his exertional limitations, while also giving due consideration to his non-exertional mental limitations.

**II.    BACKGROUND**

    **A. Factual History**

Plaintiff, who was 54 years old at the time of the Commissioner's decision, has a history of shortness of breath, chest pains, hypertension, esophageal reflux, and chronic obstructive pulmonary

---

[1] On February 14, 2013, Carolyn W. Colvin took office as Acting Social Security Commisioner, replacing Michael Astrue. She has been substituted as the named Defendant in this matter pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

disease ("COPD").  Dkt. No. 8-7 at 194-95, 198-99.  Plaintiff alleges disability beginning January 1, 2000, and maintains that his medical conditions preclude him from engaging in any gainful work activity.  Dkt. No. 8-6 at 117, 124.  Plaintiff states he was first diagnosed with COPD in 2004, when he visited Vassar Brothers Medical Center after experiencing shortness of breath and dizziness.  Dkt. No. 8-7 at 170-75.  He did not see a doctor again until an October 2009 visit to Kautilya Puri, M.D. for a consultative medical examination.  Id. at 154-57.  Dr. Puri diagnosed COPD/emphysema with a fair prognosis, noting that Plaintiff should avoid environments that could increase his respiratory complaints, but also noting that Plaintiff had no objective limitations on activities of daily living or fine motor activities.  Id. at 156.  On November 4, 2009, one day after Plaintiff's Supplemental Security Income ("SSI") application was initially denied, Plaintiff visited Vahe A. Keukjian, M.D. to establish primary care and to further evaluate his COPD and shortness of breath.  Id. at 194.  In his report, Dr. Keukjian noted that Plaintiff "ha[d] not seen a doctor [for primary care] in . . . perhaps 10 to 15 years" and that Plaintiff had "prefaced his visit by saying 'I'm here for [a] Social Security case.'"  Id.  It appeared to Dr. Keukjian that "the matter of Social Security disability [was] a speculation on [the Plaintiff's] part (or else on his girlfriend's part), based on some worsening problems he ha[d] been having over the past months, and also because of his inability to find work in his trade."  Id.  Dr. Keukjian observed that Plaintiff had "[f]ull and symmetric respiratory excursions [and his breath sounded] clear to auscultation without rales, rubs, wheezes, or rhonchi."  Dkt. No. 8-7 at 196.  In addition, Dr. Keukjian opined that Plaintiff might have an attention deficit problem because he seemed easily distracted, but Dr. Keukjian also acknowledged that such a condition seemed inconsistent with Plaintiff's past work in the photo engraving industry, a profession requiring extreme attention to detail.  Id.

2

In March 2010, upon the recommendation of Dr. Keukjian, Plaintiff underwent an exercise stress test, the results of which were non-diagnostic, and an echocardiogram, which revealed a normal sized left atrium, left ventricle with borderline left ventricular hypertrophy, and a mildly enlarged aortic root. Id. at 189-90. Plaintiff saw Dr. Keukjian in June 2010 for a follow-up appointment. Plaintiff stated that he was still experiencing exhaustion upon exertion and complained that he had begun to feel left shoulder pain when reaching behind his back; he raised no other new concerns at the appointment. Id. at 186. Dr. Keukjian noted that Plaintiff's pulmonary function tests "suggest[ed] mild to moderate obstructive airway disease rather less severe than one might expect from how he describe[d] his symptoms." Id. at 187. He diagnosed dyspnea, respiratory abnormalities, chronic airway obstruction, and anxiety-generalized disorder. Id.

Plaintiff subsequently saw Marie C. Lingat, M.D., a pulmonologist, on July 30, 2010. Dkt. No. 8-7 at 198-99. Dr. Lingat observed that Plaintiff's heart sounded normal, with regular rate and rhythm and no murmurs, and that there was normal air movement through his lungs and no signs of wheezing or rhonchi. Id. at 198. She diagnosed chronic airway obstruction, shortness of breath/dyspnea, and esophageal reflux. Id. at 199. A chest x-ray was also performed, which revealed signs of COPD, including slight pleural thickening at the right lung apex and hyperexpansion of the lungs with flattening of the diaphragm. Id. at 201. No acute process was noted. Id.

On August 16, 2010, Plaintiff saw James M. Schneider, M.D., of Capital Region Orthopaedics, to address his shoulder pain. Id. at 211. Dr. Schneider noted that while there was "no gross bony deformity . . . . [or] palpable tenderness of either shoulder[,]" Plaintiff had "significant loss of internal rotation" in his left shoulder, while his right shoulder "demonstrate[d] full range of

3

motion with evidence of impingement but no rotator cuff weakness." Dkt. No. 8-7 at 211. X-rays taken that day revealed "no evidence of bony abnormality." Id. Dr. Schneider recommended physical therapy, home exercises, and a corticosteroid injection, though Plaintiff stated he would like to wait to see if the pain would dissipate on its own. Id.

Two weeks later, on August 30, 2010, Plaintiff visited Dr. Lingat for a six-minute walk test. Id. at 202. Dr. Lingat once again assessed Plaintiff as having chronic airway obstruction. Id. Plaintiff had a follow-up appointment with Dr. Keukjian on September 13, 2010, where it was noted that Plaintiff had no upper respiratory discharge or oral lesions and no chest discomfort, palpitations, edema, or syncope. Id. at 209. Plaintiff also presented no coughing or wheezing. Id. at 209. Dr. Keukjian recommended that Plaintiff continue to use an inhaler, oxygen, and oral medications to control his shortness of breath and esophageal reflux. Id.

Beginning on April 27, 2010, Plaintiff also sought medical treatment for symptoms of anxiety and depression from Greene County Mental Health Center ("GCMHC"). Id. at 181-185. Plaintiff complained of low energy, poor concentration and focus, grief over the loss of his father, and depression that significantly worsened after he was diagnosed with emphysema. Id. at 181-82. The psycho-social assessment Plaintiff underwent indicated that while he was able to care for himself, his illness had led to changes in his level of functioning because he was easily exhausted and unable to engage in some activities, like cleaning, as thoroughly as he did before his diagnosis. Id. at 182. The assessment also indicated that Plaintiff's educational history was within normal limits although the highest academic level he achieved was seventh grade. Id. at 183. Regarding Plaintiff's appearance and behavior, the assessment noted that he was neat, well-groomed, polite, cooperative, possessed average intelligence, and had fairly good insight, judgment, and impulse

4

control.  Id. at 184.  It also indicated, however, that he was very tangential and easily distracted.  Id.  Plaintiff exhibited signs of depression, anxiety, and attention deficit disorder, and he was recommended for admission into the GCMHS clinic for treatment.  Id. at 185.

Plaintiff had three additional pre-admission screenings at GCMHS before his case was officially opened there on July 21, 2010, at which time a treatment plan was developed to help him cope with what licensed clinical social worker Laura Mercento termed "severe" and "predominantly enduring" psychosocial stressors.  Id. at 178-80.  On August 10, Plaintiff met with psychiatrist Anise Wasfi, M.D., who marked Plaintiff's psychosocial stressors as "extreme" and "predominantly enduring" and assessed a GAF score[2] of 48.  Id. at 176.  Dr. Wasfi also observed that Plaintiff presented with a "severely depressed mood" and "chronic learning disabilities," though his cognitive functioning appeared "grossly intact."  Id.  On September 14, Plaintiff completed a functional limitations worksheet on which he self-reported several functional limitations, including understanding complex sentences, communicating through writing, understanding spoken conversations, working in groups, and following workplace rules.  Id. at 203-04.  He also indicated that he struggles with bending, climbing, kneeling, pulling, pushing, reaching, standing, stooping, stretching, walking, and lifting more than ten pounds.  Id. at 207.  He asserted that heavy exertion is unacceptable.  Id.  Ms. Mercento provided additional notes, including her observations that Plaintiff seemed to have trouble following oral and written directions, lacked the endurance and stamina

---

[2] The Global Assessment of Function ("GAF") Scale rates a patient's overall level of function with respect to psychological, social, and occupational functioning.  A GAF score of 48 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social functioning (e.g., no friends, unable to keep a job)."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).

5

necessary for some work skills, and would likely experience difficulty in sustaining a consistent work effort over a five-day work week or eight-hour work day. Id. at 203-06.

   **B. The ALJ's Decision**

Administrative Law Judge Zachary S. Weiss ("ALJ") made the following findings of fact and conclusions of law. Plaintiff has not engaged in substantial gainful activity since September 11, 2009. Dkt. No. 8-2 at 15. Plaintiff suffers from COPD, hypertension, and arthritis, all of which qualify as severe impairments within the meaning of the Social Security regulations. Id. While Plaintiff does have a medically determinable mental impairment of affective disorder, it does not cause more than minimal limitation in his ability to perform basic mental work activities and is therefore non-severe. Id. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in Appendix 1. Id. at 16. Plaintiff has the residual functional capacity to perform light work, except that he cannot tolerate excessive exposure to airborne irritants or environmental allergens. Id. Plaintiff is unable to perform any past relevant work. Id. at 18. Plaintiff "was 52 years old, which is defined as a younger individual age 18-49, on the date the application was filed."[3] Dkt. No. 8-2 at 18. Plaintiff has limited education and is able to communicate in English. Id. Transferability of job skills is immaterial to the disability determination because the Medical-Vocational Rules suggest that Plaintiff is not disabled regardless of whether his skills are transferable. Id. In light of Plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the

---

[3] Obviously, ALJ Weiss incorrectly described Plaintiff as "a younger individual age 18-49." In fact, Plaintiff was 52 years old, qualifying him as an individual closely approaching advanced age. A Plaintiff's age is an important factor to consider at the fifth step of the sequential analysis, so going forward ALJ Weiss must ensure he properly identifies Plaintiff's vocational profile.

national economy that Plaintiff can perform. Id. Finally, Plaintiff has not been disabled since September 11, 2009, the date the application was filed. Id. at 19.

### B. Procedural History

Plaintiff filed an application for Title XVII Supplemental Security Income on September 11, 2009, alleging a period of disability beginning on January 1, 2000. Dkt. No. 8-2 at 13. After a hearing, the ALJ denied the application. Id. at 10. The Appeals Council denied Plaintiff's request for review on October 12, 2010, rendering the ALJ's decision the final decision of the Commissioner. Id. at 1-3. This action ensued.

## III. STANDARD OF REVIEW

### A. Scope of Review

A court reviewing the denial of a social security disability benefits claim may not decide *de novo* whether a Plaintiff is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Miller v. Comm'r of Soc. Sec., 409 F. App'x 384, 386 (2d Cir. 2010). The reviewing court may determine only whether the decision below was based upon legal error or insubstantial evidence. Id.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). If the Commissioner's decision is supported by substantial evidence, a reviewing court must sustain it "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992); see also Knighton v. Astrue, 861 F. Supp. 2d 59, 63 (N.D.N.Y. 2012) ("Where the evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). A court must afford the ALJ's determination considerable deference

and "may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

Although factual determinations are afforded a degree of deference, "[l]egal decisions are reviewed *de novo*, and '[w]here there is reasonable doubt as to whether the [hearing officer] applied the proper legal standards,' even if the ultimate decision may be 'arguably supported by substantial evidence,' the . . . decision may not be affirmed." Butler v. Astrue, 926 F. Supp. 2d 466, 474 (N.D.N.Y. 2013) (quoting Whipple v. Astrue, No. 08-CV-1356, 2011 WL 1299352, at *5 (N.D.N.Y. Mar. 8, 2011)).

**B. Social Security Benefits**

A Plaintiff is disabled for Social Security purposes if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Butler, 926 F. Supp. 2d at 474 (internal quotation marks and emphasis omitted). The Social Security regulations prescribe a five-step analysis to determine whether a Plaintiff is disabled. See 20 C.F.R. § 416.920(a)(4)(i)-(v).

The five-step analysis is sequential, meaning that the determination at each step dictates whether the analysis proceeds to the subsequent step. Gennardo v. Astrue, 333 F. App'x 609, 610 (2d Cir. 2009). The steps assess whether the Plaintiff: (1) is currently working; (2) has a severe impairment, or combination of impairments, that satisfy the duration requirement of the statute; (3) has an impairment, or combination of impairments, listed in or medically equivalent to an impairment listed in Appendix 1 of the regulations; (4) is capable of continuing in her prior type of

work; and (5) can do other work. Butler, 926 F. Supp. 2d at 474-75 (citing Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)); see also Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

Throughout the first four steps, the burden of proof lies with a Plaintiff. Butler, 926 F. Supp. 2d at 466. At the fifth step, however, the burden shifts to the Commissioner to show that "there is other gainful work in the national economy which the Plaintiff could perform." Ortiz Torres v. Colvin, No. 10-CV-0656, 2013 WL 1500470, at *6 (N.D.N.Y. Apr. 10, 2013) (citing Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002)).

## IV. DISCUSSION

Plaintiff contends that substantial evidence did not support the ALJ's findings that Plaintiff's mental health impairment is non-severe and that Plaintiff has the RFC to perform nearly the full range of light work. Dkt. No. 11 at 1.

### A. Severe Mental Impairment

To determine the severity of a mental disorder, an ALJ must first rate the degree of limitation in the four broad functional areas of: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). Activities of daily living include cleaning, shopping, cooking, and caring appropriately for personal grooming and hygiene; social functioning refers to the capacity to interact effectively and on a sustained basis with others; concentration, persistence, or pace alludes to the ability to focus attention sufficiently long to allow for the completion of tasks commonly found in work settings; and episodes of decompensation are temporary exacerbations in symptoms accompanied by a loss of adaptive functioning, which make it difficult to perform activities of daily

living, maintain social relationships, and sustain concentration, persistence, or pace. See 12.00(C) of the Listing of Impairments (20 C.F.R., § 404(P), App'x 1). An ALJ must measure the degree of limitation in the first three areas by using a five point scale: none, mild, moderate, marked, or extreme. The degree of limitation in the fourth area is measured by using a four point scale: none, one or two, three, or four or more. 20 C.F.R. § 416.920(c)(4). A mental impairment is considered severe if there is a marked degree of limitation in at least two of the first three functional areas or a marked degree of limitation in one of the first three areas *and* repeated episodes of decompensation, each of extended duration; this means three episodes within one year or an average of one every four months, each lasting for at least two weeks. See 12.04(B) of the Listing of Impairments (20 C.F.R. § 404(P), App'x 1).

The ALJ's finding that Plaintiff experiences only mild limitation in concentration, persistence, or pace is not supported by substantial evidence, as the ALJ failed to consider the ample medical evidence suggesting that Plaintiff's limitation is more severe, and instead relied almost exclusively on his own judgment and observations. Nevertheless, because substantial evidence supports the ALJ's finding that Plaintiff suffers only from mild limitations in activities of daily living and social functioning while experiencing no episodes of decompensation, the conclusion that Plaintiff's mental impairment is non-severe is supported by substantial evidence.

　　*1. Concentration, Persistence, or Pace*

To justify his determination that Plaintiff is mildly limited in concentration, persistence, or pace, ALJ Weiss pointed out that "[o]n August 10, 2010, [Plaintiff's] cognitive functioning was described as 'grossly intact' [and t]here were no significant findings in his thought process." Dkt. No. 8-2 at 16. The Core Psychiatric Evaluation to which the ALJ was referring, however, also

contained observations that Plaintiff presented with a "severely depressed mood" and suffered from "chronic learning disabilities." Id. Dr. Wasfi, the GCMHC psychiatrist who conducted the evaluation, labeled Plaintiff's psycho-social stressors as "extreme" and "predominantly enduring" and assessed a GAF score of 48—a number indicative of serious impairment in occupational functioning. Id.; see also Watson v. Astrue, No. 08-1858, 2009 WL 678717, at *5. Furthermore, the psycho-social assessment from GCMHC in April 2010 remarked that Plaintiff was very tangential, easily distracted, struggled with comprehension and focus, and exhibited symptoms of anxiety and ADD. Dkt. No. 8-7 at 181-85. This assessment, which was reviewed and approved by licensed clinical social worker Laura Mercente, also indicated that Plaintiff was prone to preoccupation, flight of ideas, and loose association. Id. at 184. In July 2010, Ms. Mercente developed a Treatment Plan approved by Dr. Wasfi that included an assessment that Plaintiff's psycho-social stressors were "severe" and "predominantly enduring." Id. at 178. In addition, Dr. Keukjian, while not a mental health physician or professional, noticed that Plaintiff seemed easily distracted and assessed him as having a generalized anxiety disorder. Id. at 196, 187. Finally, in September 2010, Ms. Mercente made comments on a Functional Limitations worksheet filled out by Plaintiff in which she expressed her opinion that Plaintiff has difficulty following oral and written directions, staying focused and on task, and sustaining a consistent work effort over an eight hour work day or five day work week. Id. at 203, 206.

The ALJ largely ignored the substantial evidence suggesting that Plaintiff struggles with more than mild limitation in concentration, persistence, or pace. The ALJ discredited the evidence because, at the hearing, Plaintiff "was responsive to questions and displayed no evidence of a learning or communication deficit," and because the ALJ believed that Plaintiff "sought

11

psychological treatment in anticipation of his social security case." Dkt. No. 8-2 at 18. The ALJ stated that he "afforded little weight" to the GAF score and Ms. Mercente's comments on the Functional Limitations worksheet because there was "little evidence" to support them, and they were "at odds with the rest of the medical evidence." Id. These are conclusory statements; they fail to make refer to any medical evidence pertaining to Plaintiff's mental health that conflicted with any of the reports from GCMHC. While it is well-settled that an ALJ may consider the supportability and consistency of medical opinions in determining their weight,[4] 20 C.F.R. § 416.927(c), here it appears that the ALJ based his evaluation exclusively on his own personal observations of Plaintiff at the hearing, rather than on any medical or laboratory findings in the record. "In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints *solely* on the basis of such personal observations." SSR 96-8p. Therefore, the ALJ's conclusion that Plaintiff has only mild limitation in the functional area of concentration, persistence, or pace is not supported by substantial evidence.

*2. Activities of Daily Living, Social Functioning, and Episodes of Decompensation*

In considering Plaintiff's activities of daily living, the ALJ noted that Plaintiff's grooming had been described as "good," that he lives alone, and that he manages to cook, clean, and shop for himself. Dkt. No. 8-2 at 16. The record also demonstrates that Dr. Puri found "no objective limitations to daily living or fine motor activities "when examining Plaintiff in October 2009." Dkt. No. 8-7 at 56. When Dr. Lingat saw Plaintiff in July 2010, however, she indicated that his activities

---

[4] Although Ms. Mercente, as a licensed clinical social worker, is not considered an "acceptable medical source," she may still provide information (albeit not to establish the existence of a medically determinable impairment) on an individual as an "other source" when such information is "based on special knowledge of the individual and may provide insight into the severity of the impairment and how it affects the individual's ability to function." SSR 06-03p.

12

were "limited and hampered due to shortness of breath." Id. at 198. Notably, on the Functional Limitations Worksheet filled out by Plaintiff and supplemented with Ms. Mercente's notes, neither Plaintiff nor Ms. Mercente indicated that any of the tasks listed under "Activities of Daily Living" were problematic for Plaintiff. Id. at 205. Furthermore, while the initial psycho-social assessment at GCMHC suggested that Plaintiff could not engage in some activities as enthusiastically as he once did, it also pointed out that he was well-groomed, possessed average intelligence, and had fairly good insight, judgment, and impulse control. Id. at 181-85. Here, substantial evidence supports the ALJ's conclusion that Plaintiff's activities of daily living are no more than mildly limited.

To justify his finding that Plaintiff has only mild limitation in the area of social functioning, the ALJ pointed to Plaintiff's ability to maintain relationships with his girlfriend and family members. Dkt. No. 8-2 at 16. The initial psycho-social assessment at GCMHC revealed that he was polite, cooperative, and very open and direct about his feelings. Dkt. No. 8-7 at 183-84. Dr. Puri noted that Plaintiff was cooperative and gave good effort during his pulmonary function tests. Id. at 157. In contrast, on the Functional Limitations Worksheet, Plaintiff marked that he has difficulty getting along with authority figures, working in groups, accepting tasks, following workplace rules, and is frequently upset or irritated. Id. at 204. Ms. Mercente did not add any additional notes to the section on interpersonal work interactions. Id. Once again, given the medical evidence detailing Plaintiff's pleasant behavior around his doctors and other medical professionals, ALJ Weiss's finding that Plaintiff is only mildly limited in social functioning is supported by substantial evidence.

Nothing in the record suggests that Plaintiff has suffered from any episodes of decompensation since the onset of his alleged disability. Therefore, ALJ's Weiss's finding reflecting this is supported by substantial evidence.

### 3. *Conclusion*

The ALJ's finding that Plaintiff suffers only from mild limitation in the area of concentration, persistence, and pace was not supported by substantial evidence. However, his ultimate determination that Plaintiff's mental impairment is non-severe remains unaffected because Plaintiff experiences no more than mild limitation in any of the other three functional areas, precluding that finding. Even so, given the preceding discussion, ALJ Weiss must properly consider Plaintiff's mental impairment at the fifth step of the sequential analysis, as limitations in concentration, persistence, and pace need to be taken into account when determining the jobs in the national economy that are available to a Plaintiff. SSR 96-8p.

**B. Residual Functional Capacity**

Step four of the sequential evaluation process requires an ALJ to determine what vocational capacity a Plaintiff retains. Butler, 926 F. Supp. 2d at 475. A Plaintiff's RFC is determined by examining the Plaintiff's own statements regarding his impairments, the observations of others who have familiarity with the Plaintiff, and the observations of medical sources. See generally 20 C.F.R. § 416.929. If a Plaintiff has the capacity to work, step five requires the examiner to determine whether a significant number of jobs exist in the national economy that the Plaintiff could perform despite his limitations. Here, in assessing Plaintiff's RFC, ALJ Weiss failed not only to complete a function-by-function analysis of Plaintiff's ability to perform the strength demands involved in light work, but also neglected to fully consider Plaintiff's medically determinable, non-severe mental

14

impairment.  Because it is imperative to assess Plaintiff's capacity to perform each exertional and non-exertional function at a given work level before determining whether Plaintiff is capable of doing the full range of work at a particular exertional level, this matter is remanded for further development of the record and re-assessment of Plaintiff's RFC using the proper functional analysis.

"Light work," as defined by the Secretary, involves the ability to lift "no more than 20 pounds at a time," lift or carry 10 pounds frequently, walk or stand often, and sit "most of the time with some pulling of arm or leg controls . . . .  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 416.967(b).  An ALJ rendering an RFC assessment, then, must include a discussion of the Plaintiff's abilities to engage in these activities on a regular and continuing basis—usually 8 hours a day, five days a week—by "describ[ing] the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  SSR 96-8p.  If an ALJ does not elaborate on a "[p]laintiff's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from accepted medical sources that include the sources' opinions as to the [p]laintiff's ability to perform each activity," then the ALJ may have overlooked some of a plaintiff's limitations or restrictions, thereby coming to an inaccurate conclusion as to the work available to the plaintiff at fifth sequential step.  Knighton, 861 F. Supp. 2d at 66.  This is why the RFC may be expressed in terms of exertional levels of work (i.e., light work) only after the ALJ has conducted a function-by-function analysis.  Hogan v. Astrue, 491 F. Supp. 2d 347, 354 (W.D.N.Y. 2007).  Here, ALJ Weiss stated that "Plaintiff has the residual functional capacity to perform light work" without providing any explanation as to how he made that determination.  Dkt. No. 8-2 at 16.  While the Second Circuit has not yet decided whether omission of the function-by-

function analysis called for by SSR 96-8p is grounds for *per se* remand or should instead be subject to harmless error analysis, Desmond v. Astrue, No. 11-CV-0818, 2012 WL 6648625, at *5 (N.D.N.Y. Dec. 20, 2012); see also id. at *5-7 (collecting cases from district courts within the Circuit as well as other jurisdictions), remand is proper regardless because the medical record must be developed more fully to determine the extent of Plaintiff's physical limitations.

Although a Plaintiff has the burden of proof throughout the first four steps of the analysis, see Butler, 926 F. Supp. 2d at 474, the non-adversarial nature of Social Security disability proceedings impose a duty upon ALJs to assist in developing the record unless such efforts would be futile. See, e.g., Ubiles v. Astrue, No. 11-CV-6340, 2012 WL 2572772, at *8 (W.D.N.Y. 2012) ("[A]n ALJ may decline to seek additional records when he 'know[s] from past experience that the source either cannot or will not provide the necessary findings.'" (quoting 20 C.F.R. § 404.1512(e)(2))). If the record contains deficiencies in a Plaintiff's medical history such that a disability determination cannot be made, the ALJ is "obligated to explore the facts by obtaining relevant medical records . . . to assist the Plaintiff in developing her case." Jones v Apfel, 66 F. Supp. 2d 518, 538 (S.D.N.Y. 1999); see also Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (quoting 20 C.F.R. § 4041512(e) ("When the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled . . . [w]e will recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available")).

While the record here contains several medical reports, few of them offer any information about Plaintiff's exertional capabilities and ability to perform work-related functions on a regular and continuing basis. Cf. Dkt. No. 8-7 at 154-211. The only medical record that addresses

16

Plaintiff's work-related capabilities is the Functional Limitations worksheet filled out by Plaintiff at GCMHC. Id. at 203-07. Ms. Mercente provided her opinion in handwritten notes on the worksheet and indicated that she believed Plaintiff unable to sustain a consistent work effort over a five-day work week or eight-hour work day. Id. at 206. The ALJ ignored Ms. Mercente's comments, implying that Plaintiff had filled out the entire worksheet. Dkt. No. 8-2 at 18. But even if ALJ Weiss had considered the worksheet, it does not provide an adequate basis to assess Plaintiff's exertional capabilities and, indeed, there is no adequate basis present in the record. As a result, the ALJ's finding that Plaintiff is not disabled is not supported by substantial evidence and the matter is remanded for further development of the record, after which ALJ must engage in a function-by-function analysis to properly determine Plaintiff's RFC.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's decision is **VACATED** and the case **REMANDED** for further proceedings consistent with this Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED:  March 11, 2014
        Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge